UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No. 1:25-cr-10014-ADB |
| | ) | |
| JENEL FLOUNOURY | ) | |
| | ) | |
| | ) | |

**Jenel Flounoury's Sentencing Memorandum**

On the surface, it may appear that Jenel Flounoury had a childhood largely free of complications. He was born in Boston and raised in Malden and then Brockton by a single mother who worked hard to support her three children on her own. There was no abuse of any kind in his home. There was violence in the neighborhood when he was young, but his mother shielded the family from outside influences. His older sister worked hard and set a strong example for Jenel, and he and his older brother, Justin, have always been extraordinarily close.

Although he projects that everything has been fine, Jenel has experienced real struggles and setbacks. He came into the world with a serious birth injury that required physical therapy, beginning in infancy, to address nerve damage and limited mobility. His father is someone Jenel knows of, but the two have no meaningful relationship.

Perhaps in response to these circumstances, the bond between Jenel, his siblings, and their mother has always been exceptionally strong. One of the best examples of this closeness is that the family has continued to live under one roof for all thirty years of Jenel's life. Even in recent months, after a fire ravaged their Brockton home and displaced them to a hotel, Jenel, Justin, and their mother have shared a single hotel room.

This crime – best described as foolish and ill-conceived– has had very serious consequences. Jenel Flounoury was proud of his position at the credit union. That he then made

such poor choices was devastating. His actions, taken hand in hand with his brother, were short-sighted and nonsensical – especially for two young men with no prior contacts of any kind with the criminal justice system. He takes full responsibility for his role. As a result, Mr. Flounoury lost his job and now works unloading boxes and stocking shelves at a discount furniture store. He is also marked as a felon, a distinction that will follow him throughout his life.

It is worth emphasizing that, at thirty years old, Mr. Flounoury had never before been in any kind of trouble. He has consistently worked hard, contributed to his family's income, and fulfilled his role as a kind and generous son, brother, and uncle. For the reasons outlined in this memorandum, the Court should decline to send Mr. Flounoury to prison for any period of time and should instead impose a sentence of community supervision, vocational training, and community service. Mr. Flounoury's advisory guideline sentencing range is correctly calculated at 10-16 months. For a first-time offender, however, a federal felony conviction carries serious and severe consequences of its own. Mr. Flounoury has complied with his conditions of pretrial release, addressed instances of marijuana use by engaging in treatment services, and nothing suggests that he will engage in future criminal behavior. In short, this process has been a lesson in itself.

Mr. Flounoury accepted responsibility for his crime and pled guilty to Conspiracy to Commit Larceny from a Credit Union, in violation of 18 U.S.C. § 371. We ask the Court to sentence him to time served (reflecting the nine days he spent in state custody at the Nashua Street Jail), followed by three years of supervised release with conditions to assist his continued rehabilitation, employment, and efforts toward restitution. The § 3553(a) factors strongly support a sentence served in the community, and any period of time in a Bureau of Prisons facility would be greater than necessary to accomplish the goals of sentencing here. His crime was non-violent,

he has no criminal history, and, put bluntly, he deserves a second chance with this Court and with our community.

## I. A Sentence of Time Served is Sufficient, But Not Greater Than Necessary, To Effectuate the Sentencing Goals of 18 U.S.C. § 3553(a).

### A. Nature of the Offense

In September 2024, Jenel Flounoury was working as a bank teller at the Energy Credit Union in West Roxbury, and his brother, Justin, was working at Verizon in South Boston. The brothers lived with their mother in a three-story family home in Brockton; their older sister lived with her children in the unit above.

The Court has heard much about this crime through the parties' pretrial litigation and the motion to suppress. It was a foolish plan, quickly unraveled by old-fashioned police work. Law enforcement conducted interviews at the credit union, reviewed the surveillance footage, and followed Jenel home to investigate further. By that evening, they had cracked the case – Jenel and his brother had hatched an ill-conceived scheme – and the case was promptly charged by the state and then adopted by the federal government. In the meantime, Mr. Flounoury spent nine days at the Nashua Street Jail before his mother was able to post bond for his release. The swift experience of being caught, incarcerated, and separated from his family and loved ones left a lasting impression on him.

The offense – conspiracy to commit larceny from a credit union – is non-violent. It is nonetheless serious, and it undermines the trust that the community holds for financial institutions and the relationship between the credit union and its members. A crime like this also carries serious consequences, including a felony conviction that attaches for life.

The nature and circumstances of the offense, however, are only one of many factors, and "[s]entencing courts are not required [..] to 'afford each section of the section 3553(a) factors

equal prominence. The relative weight of each factor will vary with the idiosyncratic circumstances of each case, and the sentencing court is free to adapt the calculus accordingly.'" *United States v. Vinas*, 106 F.4th 147, 154 (1st Cir. 2024), quoting *United States v. Rivera-Rodríguez*, 75 F.4th 1, 30 (1st Cir. 2023). *See also Koon v. United States*, 518 U.S. 81, 113 (1996) (advising that sentencing courts should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). This short-sighted decision cost Jenel greatly – he lost his job and any hope of a future in that field. He felt, and continues to feel, the shame of letting down his mother, his family, and himself. It took time for him to come to terms with this serious departure from an otherwise law-abiding life, and it is a stigma he will carry from here on out.

The consequences of Jenel's actions have reached beyond his and his brother's lives to affect their entire family. Jenel's mother was shocked and dismayed to learn of the charges. She has attended every court hearing with her sons and supported them throughout. As she stated in the Presentence Report, Jenel is a caring, friendly, and hardworking person; she does not believe he will commit another crime, and he has a strong support system to lean on when he needs it. PSR ¶ 47. This conduct is inconsistent with how Jenel and his brother were raised. The family does not condone it, but its support for each of them remains firm moving forward.

Isolation and punishment should not be the primary sentencing goals here. Rather, the § 3553(a) factors support a sentence that makes rehabilitation the priority. A time-served sentence – one that contemplates vocational training and the continued structure of United States Probation – will also deter future criminal conduct, protect the public, and support Mr. Flounoury's sincere efforts to live a lawful and productive life.

**B. Background, History, and Characteristics of Jenel Flounoury**

Jenel Flounoury grew up in a tight-knit family made up of his mother, his sister (14 years older), and his brother, Justin (4 years older). His mother worked steadily as a counselor while raising her three children. Jenel's birth was complicated: he suffered a brachial plexus birth injury, which damaged the nerves running from his spinal cord in his neck through his shoulder and arm. As a result, even after 25 years of physical therapy, he does not have a normal range of motion in his arm. As a child, he could not participate in many sports, and the nerve pain was at times very difficult to endure.

Jenel and his family moved from Boston to Malden when he was around eight years old. He remembers Malden as quieter than Boston, a place where he could play outside with friends more often. His father was not in the picture, and Jenel relied on his close relationship with his mother, sister, and brother to fill that void. After about three years in Malden, the family moved to Brockton as Jenel was entering his pre-teen and teenage years.

Jenel struggled with his grades in high school. After his freshman and sophomore years at Brockton High School, he transferred to Greater Egleston High School, where he graduated in 2014. He was proud to earn his diploma, and his family celebrated the achievement. Jenel later took some classes at community college but ultimately decided to enter the workforce and contribute to his family's income. Since then, he has worked consistently, including at FedEx, various retail stores, an optometrist's office, and a dispensary, as well as at the credit union as a teller. He is interested in pursuing an apprenticeship in the electrical trade, which would allow him to work with his hands and, eventually, for himself.

About ten years ago, Jenel's sister purchased a three-family home in Brockton. Until two months ago, she lived in the top unit with her children, while Jenel, Justin, and their mother lived on the main level. For those ten years, Jenel's mother could walk upstairs to the third floor to

care for her grandchildren, and Jenel is very proud of his role as an involved uncle. The family regularly ate dinner together after long workdays. Tragically, a fire broke out late this summer and rendered the home unlivable. Thankfully, everyone escaped without injury. They were then relocated to a hotel, where they shared very close quarters for nearly two months. Throughout this period, Jenel has continued to work and to abide by his conditions of release. Despite the upheaval caused by the fire, he got up each morning and went to work, returning each night to the family's hotel. Last week, the family moved into a rental apartment, where he now lives with his mother, sister, brother, and nephew.

## II. Advisory Guidelines

Mr. Flounoury does not dispute the Presentence Report's guideline calculation in paragraphs 26-34. Based on the charge and economic loss, the base offense level is 6, increased by 10 because the loss amount exceeded $150,000. No other enhancements apply. Mr. Flounoury qualifies as a zero-point offender under USSG §§4C1.1(a)(1)-(11). With acceptance of responsibility, the total offense level is 12, and the advisory guideline range is 10-16 months.

## III. An Appropriate Sentence is a Non-Jail Sentence

Sending Mr. Flounoury to prison would impose a sentence greater than necessary to accomplish the broad goals of sentencing. His nine days in pretrial custody at Nashua Street Jail left a vivid impression on him. *See, e.g., Rosales-Mireles v. United States*, 585 U.S. 129, 139 (2018) ("'To a prisoner,' [the] prospect of additional 'time behind bars is not some theoretical or mathematical concept.' … '[A]ny amount of actual jail time' is significant, and 'ha[s] exceptionally severe consequences for the incarcerated individual [and] for society which bears the direct and indirect costs of incarceration.'") (internal citations and quotations omitted). Moreover, where the Supreme Court has recognized that probationary sentences are qualitatively different but nonetheless restrictive, a non-carceral, community-based sentence would still limit

Mr. Flounoury's liberty and permit significant sanctions for any violation of supervised release conditions. *See, e.g., Gall v. United States*, 552 U.S. 38, 48-49 (2007).

Under 18 U.S.C. § 3553(a), the Court must impose a sentence that is "sufficient but not greater than necessary" to achieve the goals of sentencing. The Court must also consider **the kinds of sentences available** and how to "provide the defendant with the needed **educational or vocational training**, medical care, or other correctional treatment **in the most effective manner."** 18 U.S.C. § 3553(a)(2)(D) (emphasis added). Rather than a formulaic or rigid approach, the statute requires a broad analysis that considers the whole person, his circumstances, and how best to support his successful reentry into the community. The district court has wide latitude to make individualized sentencing determinations through a holistic and flexible inquiry grounded in the § 3553(a) factors. *See, e.g., Gall v. United States*, 552 U.S. 38 (2007).

It is also well recognized that "imprisonment is not an appropriate means of promoting correction and rehabilitation," and a sentencing court "cannot impose a prison term to assist a defendant's rehabilitation." *Tapia v. United States*, 564 U.S. 319 (2011), quoting 18 U.S.C. § 3582(a). Here, Mr. Flounoury would benefit from structured vocational training to bridge the gap between his current work and a sustainable career. His goal is to connect with someone in the electrical field and work as an apprentice. Mr. Flounoury is looking ahead to working with United States Probation and its resources to support him in this endeavor.

In short, the Court is not bound by the advisory guideline range of 10-16 months. While the Court is required to compute the Guideline Sentencing Range as a "starting point and the initial benchmark," the Guidelines are neither the only factor nor even the first among the factors that Congress has commanded courts to apply under section 3553(a). The Court "may not presume that the Guidelines range is reasonable" and must "make an individualized

assessment based on the facts presented." *See Gall v. United States*, 552 U.S. 38, 49-50 (2007). The guidelines are only "a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 351 (2007). The Court is free to reject a guideline sentence, "perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Id*. at 350-351. This Court has the power and the responsibility to consider all of the circumstances and to fashion a sentence that fits the person before it.

At thirty years old, Jenel is now a convicted felon, a status that will have repercussions throughout his adult life. Before this offense, he had never been convicted of a crime. Now, he stands convicted of a federal felony, faces thousands of dollars in restitution, and has lived for the last years with the possibility of a carceral sentence in this case. It must not be ignored that a felony conviction forever changes one's status in this country and carries significant collateral consequences. His rights to serve on a jury, to obtain loans, and to receive many federal benefits may be restricted temporarily or removed permanently. Courts have recognized that the stigma of a felony conviction constitutes punishment in and of itself. *See United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) ("Sometimes [courts do not] fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong that they committed"); *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant"); *United States v. Smith,* 683 F.2d 1236, 1240 (9th Cir. 1982) ("The stigma of a felony conviction is permanent and pervasive."); *see also* Wayne A. Logan, "Informal Collateral Consequences," 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave.").

That Jenel has been prosecuted for a felony in federal court, and will carry that conviction for the rest of his life, already reflects the seriousness of the offense and promotes respect for the law. And because he has never before been convicted of a crime, he does not require the lengthier sentence that might be necessary for someone undeterred by a prior sentence.

The Court should not view the absence of a prison term as insufficient punishment under the circumstances of this case. In *Gall*, the Supreme Court upheld a sentence of probation for a defendant whose guideline range was 30-37 months' imprisonment, recognizing the serious nature of a non-custodial sentence:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. Most probationers are also subject to individual 'special conditions' imposed by the court. *Gall v. United States*, 552 U.S. 38, 48-49 (2007).

A lengthy term of supervised release will impose real limitations on Mr. Flounoury's liberty. His performance on pretrial release in this case since December 2024 demonstrates that he will be a good candidate for supervision. A federal felony record, combined with a significant term of supervised release, is a just punishment and is sufficient to deter Mr. Flounoury – and others similarly situated – from committing such a crime in the future.

The Supreme Court also recognized that imposing a term of incarceration in the name of promoting respect for the law, where a particular defendant's unique circumstances suggest a more moderate alternative, could actually promote *disrespect* for the law:

> Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means

to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Id.*

Here, community supervision is a significant sentence for this defendant, particularly given that he has been on pretrial release from December 2024 to the present. Jail should be the last resort. Mr. Flounoury knows full well that if he fails to comply with the conditions of supervision, he will quickly return to court and will likely face jail. He is motivated and capable of rehabilitation in the community, and he wants to give back to the community harmed by his crime.

## IV. Conclusion

Mr. Flounoury comes before this Court having owned his mistake fully and without excuse. A sentence of time served, followed by three years of supervised release with conditions that support his continued rehabilitation, is sufficient, but not greater than necessary, to achieve the purposes of sentencing. Mr. Flounoury respectfully asks the Court to impose that sentence.

Respectfully submitted,

Mr. Jenel Flounoury
By his Attorneys,

*/s/ Cara McNamara*
Cara McNamara
*/s/ Forest O'Neill-Greenberg*
Forest O'Neill-Greenberg

Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061
forest_oneill-greenberg@fd.org
cara_mcnamara@fd.org

CERTIFICATE OF SERVICE

I, Cara McNamara, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on October 13, 2026

*/s/ Cara McNamara*
Cara McNamara