UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | No. 25-cr-10014-ADB |
| JENEL FLOUNOURY and JUSTIN FLOUNOURY, Defendants | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Defendants, Jenel and Justin Flounoury ("Jenel" and "Justin"), staged a bank robbery at the Credit Union where Jenel had been employed, netting the two almost $200,000. Just over one week before trial, the two pled guilty to conspiracy to commit bank larceny, in violation of 18 U.S.C. §§ 371 and 2113(b).

For the reasons that follow, the government asks this Court to impose identical sixteen month sentences for each Defendant, which represents a sentence at the high end of the Guidelines Range as calculated by the parties and Probation.

**Procedural History**

On January 16, 2025, a Grand Jury returned an indictment charging Jenel and Justin Flounoury with Bank Larceny and Conspiracy, in violation of 18 U.S.C. §§ 2113(b) and 371. [D. 21]. Following the denial of a motion to suppress on January 21, 2026, the Court severed the conspiracy and substantive offense counts, and, the matter was scheduled for trial on August 3, 2026.[1] [D. 75, 109]. After the filing of witness and exhibit lists, and, after the government had

[1] Jury empanelment was scheduled to commence August 3, 2026, with testimony to begin August 10, 2026.

begun meeting with and preparing witnesses for trial, on July 22, 2026, the Defendants elected to plead guilty. [D. 115-119, 122].

Pursuant to plea agreements, the Defendants pled guilty to the conspiracy charge and the government agreed to dismiss the substantive bank larceny charges. [D. 123-24]. The Rule 11 proceedings took place on July 24, 2026. [D. 125].

## FACTS

Justin ("Justin") and Jenel ("Jenel") Flounoury formulated a plan to steal from the Energy Credit Union ("ECU"), where Jenel had then been working as a teller, by staging a robbery in which Justin would pose as a robber. PSR, ¶ 11.

On the day of the robbery, Justin arranged to leave early from his work and made arrangements to be driven to the ECU. PSR, ¶12. Co-workers at Justin's employment observed that Justin had a crutch that day, claiming he was leaving early for a doctor's appointment. *Id*.

On Tuesday, September 24, 2024 at approximately 12:55p.m., Justin entered the Energy Credit Union wearing dark clothing, a surgical mask, sunglasses, and a ball cap, and walking with a crutch. Justin then approached Jenel and passed him a note that read "Hand it Over." PSR, ¶14.

Rather than provide the "robber" with the limited amount of cash in his teller drawer – Jenel got up from his chair and entered the Credit Union's vault room. There, Jenel gathered just under $200,000 in cash from the Credit Union's safe. Unable to carry that amount in his hands, Jenel got a bag from within the vault, and placed that cash inside to provide to Justin. Ultimately, Jenel turned over $197,146 from the ECU vault. PSR, ¶15.

Employees at the bank reviewing surveillance of the robbery were immediately suspicious of Jenel's conduct during the robbery. They found it unusual, and contrary to training, that Jenel did not provide the robber with the money from his cash drawer. It was also inconsistent with

bank policies for $200,000 to be stored in a portion of the vault that could be accessed by Jenel alone. PSR, ¶18.

Because officers were suspicious of Jenel's conduct, he was followed home to Brockton after the robbery. Within hours of his arrival home, Jenel and Justin were observed lighting a fire on a grill, and then burning dark colored clothing, consistent with that worn by Justin during the robbery. These events were captured on video, and, burnt clothing was later recovered from the grill. PSR, ¶19.

Pursuant to a state search warrant issued the night of the robbery, $160,275 in cash was recovered from the second-floor apartment shared by Justin and Jenel, which included ten $100 bills ("bait bills") that were known to have been present in the ECU vault prior to the staged robbery based on their serial numbers. The proceeds of the robbery had been shared between the Defendants with roughly half of the money found in each Defendant's bedroom. PSR, ¶¶20.

## Advisory Sentencing Guidelines

### A. The GSR Calculation and Plea Agreement

The parties and Probation calculate the Sentencing Guidelines as follows:

a) Defendants' base offense level is 6 (USSG § 2X1.1(a), 2B1.1(a)(2));
b) Defendants' offense level is increased by 10, because the loss was greater than $150,000 (USSG § 2B1.1(b)(1)(F));
c) Defendants' offense level is decreased by 2 levels, because Defendants ares zero-point offenders (USSG § 4C1.1); and
d) Defendants' offense level is decreased by 2, because Defendants have accepted responsibility for Defendants' crimes (USSG § 3E1.1).[2]

[2] The government has noted a potential error its plea agreement calculation. Pursuant to USSG § 1B1.1, the reduction for acceptance of responsibility should be calculated prior to the reduction for zero-point offender status. In this case, that means that at the time that the acceptance of responsibility should have been calculated, the Defendants would have been eligible for a third point because the offense level was 16. That said, even if correct, the error has no substantive impact. The government would not move for a third point reduction under USSG §3E1.1(b), because the Defendants did not plead guilty before the government had commenced preparing for trial.

Pursuant to these calculations, the total offense level is 12. With a criminal history category of I, each Defendant's GSR is 10-16 months' imprisonment. No substantive objections were filed.

Pursuant to Plea Agreements with both Defendants, the government agreed to recommend a within Guideline sentence, *i.e.*, between 10-16 months.

**ARGUMENT**

The government urges this Court to impose, for each Defendant, a sentence of sixteen months, three years of supervised release, a within Guideline fine (unless the Court determines the Defendants are unable to pay), restitution of $197,146, and forfeiture as set forth in the Plea Agreements.[3]

Though neither has a criminal history, these Defendants staged a *violent* crime. They did so in a commercial bank, in a residential neighborhood in the West Roxbury section of Boston, in the middle of the day, at time when many other employees, and other customers, were present.

To be clear, the correct charge in this case is bank larceny. And the government, in seeking a high-end within Guideline sentence, in no way suggests otherwise. No other teller was present during the staged robbery, and no other employee or customer of the bank interacted with Justin or was placed in fear. Thus, despite this crime bearing every hallmark of a typical note bank robbery, the Defendants did not steal from the ECU by "force, violence, or intimidation." 18 U.S.C. § 2113(a).

[3] The government further seeks forfeiture of the total proceeds of the robbery, with the cash recovered ($160,275) to be ordered forfeited, and, a money judgment ordered for the balance ($36,871). In the plea agreement, the government has agreed to seek authority to apply the forfeiture of the amount of cash recovered ($160,275) toward the restitution award. [D. 123-124], p. 4.

Nonetheless, in the view of the government, the Court should, more than any other factor here, consider the risks and dangers actually created by the Defendants' conduct, not reward them for the fortuitous chance that they successfully carried out this crime without involving others. If even one employee had been impacted or threatened, this would be a very different Guideline calculation, likely in the range of 51-63 months.[4] It is a matter of luck alone that this crime did not result in a far higher Guidelines range.

Even fake or staged robberies risk significant, even deadly, consequences. Well-meaning civilians could seek to interrupt a staged "robbery" no less than a real one.[5] And, law enforcement's response, unaware of the fake nature of the robbery, can be similarly dire, whether in seeking to confront or apprehend suspects.[6]

The crime was calculated, thought out, and planned with both Defendants actively participating to complete it. Jenel stored a very substantial amount of cash in a section of the vault he could access alone well before the robbery. Jenel went to the vault and collected nearly $200,000 and provided it to Justin. Jenel then lied to responding officers, claiming not to know the robber. Justin arranged to leave early from work for a fraudulent doctor's appointment, brought a crutch to work to sell the lie, and, arranged to be driven to and from the scene of the crime. *Both* sought to destroy evidence of the crime, burning the clothing worn by Justin during

[4] This figure presumes application of USSG §2B3.1, which would entail a BOL of 20, a two-level enhancement for robbing a financial institution, and an additional two-level enhancement based on loss. See USSG §2B3.1(a), (b)(1), and (b)(7)(C).

[5] See, e.g., https://nypost.com/2024/04/09/us-news/texas-station-gas-station-robbery-that-ended-with-bystander-killing-suspect-was-staged-as-visa-scheme/.

[6] See, e.g., https://www.nbcnews.com/news/crime-courts/friendly-fire-death-nyc-officer-leads-murder-charges-robbery-suspect-n971396.

the robbery. Neither, despite claiming to this Court to have "fully" accepted responsibility, has identified where the missing $38,000 can be located. That fact alone is telling.

In support of arguments for approximately one week time-served sentences (9 days in custody for Jenel, 10 days for Justin), both Defendant's point to: (1) a lack of criminal history; (2) employment, and (3) strong family support. [D. 129-130]. Not one of those factors were absent at the time the two brothers decided to commit this crime. Both Defendants had seemingly solid employment, and the government in no way doubts both had strong family support. Yet both chose to commit this crime.

Whatever combination of circumstances led to that choice will not be minimized in the future. Needless to say, neither is likely to stop associating with their conspirator. And though neither the government nor Court can know exactly what led to this choice, we do indisputably know that stable employment, strong family support, and a lack of criminal history did nothing to prevent the two brothers from planning and carrying out this crime. Stated differently, the Defendants point only to conditions which existed at the time of the crime as reasons to believe that they will not commit further crimes.

Despite having all of those advantages, these defendants chose to stage a violent crime. Whatever punishment the Court chooses will inform the Defendants' future choice about whether to take the proverbial easy way out again. Specific deterrence dictates that a significant sentence is appropriate. Similarly, the sentence imposed should be sufficiently long that other individuals contemplating similar crimes will be deterred. One-week sentences are woefully insufficient to that task.

## Conclusion

These Defendants staged a dangerous and violent crime, that, fortuitously, did not endanger others. That good fortune should not, in any way, diminish the seriousness of this offense. Neither employment, nor family support, nor a lack of criminal history represented any deterrent, nor do those factors represent reasons to believe these defendants will not re-offend.

For these reasons, the government requests that the Court sentence each Defendant to a term of 16 months imprisonment, followed by a 36 month term of supervised release (including the mandatory and special conditions of release set forth in the PSRs (pp. 22-23[7])), restitution of $197,146, forfeiture as set forth in the Plea Agreement, and such assessments and fines as the Court determines the Defendants are able to pay.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: *<u>/s/ Mark J. Grady</u>*
Mark J. Grady
John Potapchuk
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served via ECF notice.

*<u>/s/ Mark J. Grady</u>*
Mark J. Grady
Assistant U.S. Attorney

---

[7] As to Jenel, the government further requests that Jenel be prohibited from working in any bank or financial institution during the term of supervised release.